## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOO CHUAN GOH, derivatively on behalf of MONGODB, INC., | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| DEV ITTYCHERIA, MICHAEL LAWRENCE GORDON, ARCHANA AGRAWAL, ROELOF BOTHA, HOPE COCHRAN, FRANCISCO D'SOUZA, CHARLES M. HAZARD, JR., TOM KILLALEA, ANN LEWNES, JOHN MCMAHON, and DWIGHT MERRIMAN, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | **JURY TRIAL DEMAND** |
| -and- | |
| MONGODB, INC., a Delaware Corporation, | |
| Nominal Defendant. | |

Plaintiff Joo Chuan Goh ("Plaintiff"), derivatively on behalf of MongoDB, Inc. ("MongoDB" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Baxter v. MongoDB, Inc., et al.*, Case No. 1:24-cv-05191 (S.D.N.Y); (iii) corporate governance documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of MongoDB, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least August 31, 2023, to May 30, 2024 (the "Relevant Period"). During that time the Defendants (as defined herein) caused or allowed MongoDB to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.      Beginning in August 2023, MongoDB provided its investors with material information concerning MongoDB's expected revenue for the fiscal year 2025, emphasizing confidence in MongoDB's restructuring of its sales force incentives and reducing pressure on upfront commitments to reduce friction in enrollment, particularly in its ability to acquire new customers, increase growth, and maintain revenue.

3.      While the Company painted a positive picture of its expected financial performance, these overwhelmingly positive statements hid the fact that there was a significant reduction in the information gathered by their sales force as to the trajectory for the new Atlas enrollments without upfront commitments, reduced pressure on new enrollments to grow, and a significant loss of revenue from unused commitments.

4.      On March 7, 2024, MongoDB held an earnings call after announcing its fiscal year 2024 earnings. The Company announced an anticipated near zero revenue from unused Atlas commitments in fiscal year 2025, as well as a decrease in revenue of approximately $40 million, attributed to the Company's decision to change their sales incentive structure to reduce enrollment frictions. Additionally, MongoDB provided new guidance for its fiscal year 2025 (ending January

31, 2025). The Company projected only 14% growth, compared to a projected 16% for the previous year, which had resulted in an actualized 31% growth.

5.     Stockholders and analysts reacted immediately to MongoDB's revelation. The price of MongoDB's common stock declined dramatically. From a closing market price of $412.01 per share on March 7, 2024, MongoDB's stock price fell to $383.42 per share on March 8, 2024, a decline of about 7% in the span of just a single day.

6.     The Company continued to build up the projected revenue outlook and anticipated growth for fiscal year 2025. During an earnings call March 27, 2024, MongoDB failed to disclose additional issues and difficulties arising out of the Company's sales force restructure, while reiterating confidence in the Company's below-market expectations and understanding of the existing macro landscape.

7.     The full truth finally emerged on May 30, 2024, when MongoDB lowered its fiscal year 2025 growth projections even further, again attributing the changes to the Company's decision to change their sales incentive structure to reduce enrollment frictions, along with some allegedly unanticipated macro headwinds.

8.     Again, stockholders and analysts reacted strongly to MongoDB's revelations. The price of MongoDB's common stock declined almost 24% from a closing price of $310.00 per share on May 30, 2024, to close at $236.06 per share on May 31, 2024.

9.     Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## PARTIES

### A.    Plaintiff

10.    Plaintiff Joo Chuan Goh is a current shareholder of MongoDB, has continuously held MongoDB stock during all times relevant hereto, and is committed to retaining MongoDB shares through the pendency of this action to preserve Plaintiff's standing. Plaintiff will adequately and fairly represent the interests of MongoDB and its shareholders in enforcing its rights.

### B.    Nominal Defendant

11.    Nominal Defendant MongoDB is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 1633 Broadway, 38th Floor, New York, NY 10019. MongoDB common stock trades on the Nasdaq Stock Market under the ticker symbol "MDB."

### C.    Individual Defendants

12.    Defendant Dev Ittycheria has served as President, Chief Executive Officer ("CEO") and a director of the Company since September 2014.

13.    Defendant Michael Lawrence Gordon served as the Company's Chief Financial Officer ("CFO") from July 2015 until November 2018. In November 2018, Defendant Gordon took on a dual role as the Company's CFO and Chief Operating Officer ("COO"), which role he continues to hold today.

14.    Defendant Archana Agrawal has served as a Company director since August 2019.

15.    Defendant Roelof Botha has served as a Company director since December 2013. Defendant Botha serves as a member of the Audit Committee.

16.    Defendant Hope Cochran has served as a Company director since December 2016. Defendant Cochran serves as the Chair of the Audit Committee.

17.     Defendant Francisco D'Souza has served as a Company director since November 2019. Defendant D'Souza also serves as a member of the Nominating and Corporate Governance Committee.

18.     Defendant Charles M. Hazard, Jr. has served as a Company director since October 2009. Defendant Hazard also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

19.     Defendant Tom Killalea has served as a Company director from December 2015 and as Chairperson of the Board since July 2019. Defendant Killalea also serves as a member of the Nominating and Corporate Governance Committee.

20.     Defendant Ann Lewnes has served as a Company director since December 2023.

21.     Defendant John McMahon served as a Company director between October 2016 and June 2024.

22.     Defendant Dwight Merriman is a co-founder of the Company and has served as a Company director since July 2020. He also served as a Company advisor from July 2007 until becoming a director in July 2020.

23.     Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, Merriman, and McMahon are herein referred to as "Director Defendants."

24.     Defendants Ittycheria and Gordon are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this court under 28 U.S.C. § 1391, because MongoDB is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.     Company Background

29.     MongoDB develops data platforms and integrated services systems through its document-oriented database program. The Company offers its original localized MongoDB platform, which incorporates a physical server, coined "MongoDB Enterprise Advanced" ("EA"), and a cloud-based alternative, MongoDB Atlas ("Atlas").

### B.     MongoDB's False and Misleading Statements

30.     From at least August 23, 2023 through May 30, 2024, MongoDB and its executive officers made materially false and misleading statements regarding its projected revenue for the fiscal year ended January 31, 2025. Specifically, the Defendants made or caused the Company to make statements expressing confidence in the Company's recent restructuring of its sales incentive plan, and downplaying the severity of decreases in the Company's upfront commitments to ease the speed of enrollment, allowing the Company to gain new customers, increase growth, and therefore maintain revenue.

***August 31, 2023***

31.     On August 31, 2023, MongoDB held a call for stockholders and analysts to discuss

second quarter fiscal year 2024 results. During his opening remarks, Defendant Ittycheria

discussed details of the Company's new sales incentive plan:

> Historically, the most significant source of friction has been negotiating with
> customers to secure an upfront Atlas commitment since it can be hard for customers
> to forecast consumption growth for a new workload. Given our high retention rates
> and the underlying consumption growth, several years ago, we began reducing the
> importance of upfront commitments in our go-to-market process to accelerate
> workload acquisition. This year, we took additional steps in that direction.
>
> For example, we no longer incentivize reps to sign customers to 1-year
> commitments. Obviously, this has short-term impact on our cash flow, but positions
> us better for the longer term by accelerating workload acquisition. We are pleased
> with the impact these changes have had in the business in the first half of the year.
> Specifically, new workload acquisition has accelerated, especially within existing
> customers. We believe that our efforts to reduce friction are resulting in more
> efficient growth, and we'll always look for ways to improve our go-to-market
> approach to make it even easier for customers to bring new workloads onto our
> platform.

32.     Defendant Gordon further detailed the impact of this change on MongoDB's

projected growth, emphasizing overall increases in revenue despite the decline in upfront revenue

from the Atlas product:

> Finally, as Dev mentioned, we continue deemphasizing the value of upfront
> commitments. So we're seeing fewer of them. In other words, we are intentionally
> collecting less cash upfront in order to win more workloads more quickly. As
> evidence of this, we grew Atlas revenue 38% year-over-year, while Atlas dollars
> committed upfront actually declined 15% year-over-year.
>
> Lower upfront commitments only impact the timing of when our customers pay us,
> not the total payment. But this trend of declining upfront commitments will impact
> the relationship between our non-GAAP operating income and operating cash flow
> in the medium term.
>
> I'll provide some more context on our guidance. First, we have modestly raised our
> Atlas outlook for the rest of the year, primarily to reflect a slightly stronger Q2 and
> therefore, a higher starting ARR for the second half. We continue to expect that

Atlas consumption growth will be impacted by the difficult macroeconomic environment throughout fiscal '24.

\*        \*        \*

Second, we expect to see a significant sequential decline in non-Atlas revenues in Q3 as we simply don't expect similar new business activity, especially when it comes to licensing deals. For that particular line of business, Q2 was extreme positive outlier.

33.     During the question and answer portion of the call, Defendant Gordon continued to

downplay impact of reduced upfront commitments in the Atlas product:

<Q: Keith Weiss - Morgan Stanley - Analyst>… And then the question for Michael. You talked about the commitments coming down, the Atlas commitments coming down and that being a drag on operating cash flow. Any sense you could give us on how long that drag on OCF persists? Is there any way to size that impact over time?

<A: Michael Lawrence Gordon> And on your other question, Keith, it's been a multiyear journey where we've been focused on reducing friction and accelerating new workload adoption. I do think as we called out, we continue to make additional steps and Dev called out some of the specific incremental steps this year. I think it's part of a transition. If you look at the Atlas revenue growth, Atlas grew 38% year-over-year, but dollars collected upfront shrank 15%, right? And so that gives you a sense for the magnitude or the divergence there that's showing up in the op income versus OCF bridge. I think like most things, there'll be a transition time period, but then it will settle into a more normalized level, but we think we've still got like a little bit more transition to go as we kind of work through the balance of the year.

\*        \*        \*

<Q: Brad Robert Reback - Stifel, Nicolaus & Company, Inc. - MD & Senior Equity Research Analyst> I'm not sure Dev or Michael, but going back to the commentary on fewer upfront Atlas commits. Oftentimes, when customers sign multiyear deals and pay upfront, they get a better rate. So if we were to think about not having them pay you upfront and make long-term commits, is that a net margin benefit to you guys on the pricing side?

<A: Michael Lawrence Gordon> Yes. So a couple of things. Thanks Brad for the question. In general, for us, even before the sort of evolution and changes in multiyear deals, typically, they were not all paid upfront. Typically, ours has been annually billed. But yes, to your point, I think as we've reduced upfront commitment, you have a couple of dynamics. The key one is when we are not

motivating it or providing an incentive to our sales force, and wind up being customer driven, the leverage in that negotiation shifts. And on the margin, that is helpful for ultimate pricing or discount and it winds up with sort of better pricing for us, less discounting to the customer.

### *December 5, 2023*

34.    On December 5, 2023, the Company issued a press release announcing financial results for the third quarter of fiscal year 2024. During a call for analysts and investors later that same day, Defendant Ittycheria touted the ongoing success of both MongoDB's EA and Atlas growth, noting EA again exceeding expectations and an increase in Atlas clients due to the shift in sales strategy:

> We had a healthy quarter of new business acquisition led by continued strength in new workload acquisition within our existing customers. In addition, our Enterprise Advanced business again exceeded our expectations demonstrating strong demand for our platform and the appeal of our run anywhere strategy.

> Moving on to Atlas consumption trends. The quarter played out in line with our expectations . . . This quarter, we held our most recent global Customer Advisory Board meeting, where customers across various geographies and industries came together to share feedback and insight about the experience using MongoDB. From these discussions as well as our ongoing C-suite dialogue with our customers, a few themes emerge.

35.    Defendant Gordon also touted the Company's success in his opening remarks:

> Shifting to our product mix. Let's start with Atlas. Atlas grew 36% in the quarter compared to the previous year and represents 66% of total revenue compared to 63% in the third fiscal 2023 and 63% last quarter. As a reminder, we recognize Atlas revenue primarily based on customer consumption of our platform and that consumption is closely related to end-user activity of the application, which can be impacted by macroeconomic factors.

> Let me provide some context on Atlas consumption in the quarter. Week-over-week consumption growth in Q3 was in line with our expectations and stronger than Q2. As a reminder, we were expecting an uptick in consumption in Q3 compared to Q2 based on what we've experienced and shared with you last year. We had forecast that seasonal improvement to be less pronounced this year compared to last year given that, overall, we've seen less consumption variability this year and that is exactly how the quarter played out.

*     *     *

Turning to non-Atlas revenues. EA exceeded our expectations in the quarter as we continue to have success selling incremental workloads into our existing EA customer base. Ongoing EA strength speaks to the appeal and the success of our run anywhere strategy. The EA revenue up was in part a result of more multiyear deals than we had expected. . . . Turning to customer growth. During the third quarter, we grew our customer base by approximately 1,400 customers sequentially, bringing our total customer count to over 46,400, which is up from over 39,100 in the year ago period. Of our total customer count, over 6,900 are direct sales customers, which compares to over 5,900 in the year ago period. The growth in our total customer count is being driven primarily by Atlas, which had over 44,900 customers at the end of the quarter compared to over 37,600 customers in the year ago period. It is important to keep in mind that the growth in our Atlas customer count reflects new customers to MongoDB in addition to existing EA customers adding incremental Atlas workloads.

36.     Defendant Gordon then provided guidance for the remainder of fiscal year 2024:

For the full fiscal 2024, we are increasing our outlook across the board. We now expect revenue to be in the range of $1.654 billion to $1.658 billion.

*     *     *

I'll now provide some context on our guidance. First, we expect Q4 Atlas consumption growth to be impacted by the seasonal slowdown around the holidays. Second, as you think about both sequential and year-over-year revenue growth of Atlas in Q4, keep in mind that in Q4 last year, we had several million dollars more of revenue coming from unused commitments, which we do not expect to occur this quarter. Third, as a result of our strong execution so far this year, we are again raising our non-Atlas revenue expectations for Q4. However, we expect that our non-Atlas revenues will decline sequentially Q4 versus Q3. This is different from our normal pattern as we usually see a seasonal uptick in Q4 due to greater renewal activity.

37.     During the question-and-answer portion of the call, Defendants Ittycheria and Gordon were asked about the Company's growth with EA, the impact of the shift in sale strategy for Atlas, and expectations for fiscal year 2025:

<Q: Raimo Lenschow - Barclays Bank PLC - Analyst> Congrats from me as well. I wanted to ask on EA first. Another very strong quarter there. Can you talk a little bit more on the drivers there? Because I do seem to remember you kind of doubled down on sales capacity. I think it was junior sales guys that you wanted to put on existing accounts. Is that kind of the main driver?

Or is it more like modernization are kind of picking up a lot more than what we thought would be possible? Can you speak to that because it's like the second quarter in a row where we kind of have better numbers there? And then I have one follow-up for Michael.

<A: Dev C. Ittycheria> Yes. So Raimo, with regards to our EA outperformance, I think it really speaks to our run anywhere strategy, where customers really value the ability to build on MongoDB and for essentially future-proof their deployment model, whether they stay on-prem also move to the cloud or move from one cloud to another cloud. And the fact that they can do that without having to rewrite the application is very compelling for customers.

As you also said, a lot of customers still -- especially the largest customers still have a lot of sunk cost and they want to leverage their existing data infrastructure. So a lot of customers have told us that they will still deploy infrastructure on-prem for the foreseeable future. But what -- by building on MongoDB, they get the benefits of a modern platform and the optionality to also remove the cloud when they're ready to do so.

<A: Michael Lawrence Gordon> Yes. The other thing, I know you know, Raimo, but just for the broader audience, we run the business on a channel basis, sales isn't oriented around products. And then also, as we've said before, EA tends to be -- the additional sales of EA tend to be to existing customers. We don't tend to have a ton of new -- brand new customers on EA. . . .

\*       \*       \*

<Q: Karl Emil Keirstead - UBS Investment Bank, Analyst> . . . Mike, you had talked on the last call a little bit more about this mix shift away from multiyear Atlas commits. And you were pointing to that as a reason for some of your metrics like DR and I think even cash flow to come under a little pressure. This quarter, I see DR is still under pressure. Cash flow was a little bit better. Can you maybe revisit that phenomenon and describe how it's impacting some of these metrics?

<A: Michael Lawrence Gordon> Yes, a couple of things. As we've said from the beginning, some of those like calculated billings or deferred revenue metrics aren't super helpful or don't provide a ton of insight in terms of how we run the business. We've also talked about how -- over the last couple of years, one of the things we've been trying to do is reduce friction for the sales force. Some of that includes reducing the emphasis around upfront commitments.

And so that helps accelerate landing new workloads and things like that, and that will flow through or does flow through the financial statements as less upfront deferred and things like that. And so it allows us to sort of synthetically cover more ground from a sales force perspective. And so you do see that continuing to go

through. We shared the stat, the statistic last quarter. The Atlas revenue growth last quarter was 38%, but dollars of committed Atlas declined 15% year-over-year, just as one way to try and help dimensionalize it.

We also talked, I think, earlier in the year about how roughly 80% of Atlas doesn't flow through deferred. And so I think all of those data points help kind of line up to explain the rest of what you're seeing and why that's not sort of a helpful forwardlooking metric like it might be in other companies. It doesn't kind of give you the insight that maybe people are used to or hope that, that will provide.

\*      \*      \*

<Q: Kasthuri Gopalan Rangan - Goldman Sachs Group Inc - Head of Software Coverage> Dev and Michael, happy holidays, congrats on the results. So going into calendar '24, how does the management team feel relative to going in to come to '23 with respect to how macro conditions are no longer impacting or maybe they are impacting some aspects of the business? Any verticals that stand out that you feel particularly excited about? So just wanted to understand how MongoDB is therefore fitting into customer priorities as you get into 2024?

 <A: Dev C. Ittycheria> Hi, Kash, thanks for the question. I think compared from last year, this year, we don't see things getting worse, but we don't see things getting better. Where I'd say last year with the Fed raising rates, you could really sense that people are getting much more cautious. And it was -- there was probably more negativity in terms of the outlook coming into calendar 2023.

So that being said, we definitely see innovation being a priority for customers. We clearly are, I would say, in the distinction between must-have and nice-to-have clearly in the first category. But customers also, as I mentioned in the prepared remarks, we remain focused on being sensitive to costs and ensuring that any investments, they may have a high ROI.

So we feel that we're well-positioned in terms of use cases or segments. I would say, in general, there's no real kind of material change in any -- across any vertical industry or geography. We do see -- I mean we were at re:Invent last week, and we had an amazing set of conversations with lots of senior level customers. I think we're really viewed as a mission-critical platform by all our customers. And I think people view us as a platform that they can bet on long term.

And so we see less, I would say, focus on like point solutions and more about like trying to leverage MongoDB for more and more use cases. And I would say that, that's pretty consistent across industries and geographies

<A: Michael Lawrence Gordon> Yes. The only other thing I'd add, Kash, is clearly, things have stabilized. We are not guiding fiscal '25. But just looking out, there's clearly a difficult EA and non-EA compare that people should sort of keep in mind.

And I think the big assumption or the big determiner will be people's macro outlook in terms of how that affects the fiscal '25 numbers. But those are probably the key things to keep in mind.

### *March 7, 2024*

38.     On March 7, 2024, MongoDB issued a press release announcing financial results for the fourth quarter and fiscal year 2024 results. The press release also included guidance for the following fiscal year. The press release stated:

**Full Year Fiscal 2024 Financial Highlights**

●      Revenue: Total revenue was $1.68 billion for the full year fiscal 2024, an increase of 31% year-over-year. Subscription revenue was $1.63 billion, an increase of 32% year-over-year, and services revenue was $55.7 million, an increase of 14% year-over-year.

●      Gross Profit: Gross profit was $1.26 billion for the full year fiscal 2024, representing a 75% gross margin compared to 73% in the year-ago period. NonGAAP gross profit was $1.30 billion, representing a 77% non-GAAP gross margin, compared to a non-GAAP gross margin of 75% in the year-ago period.

●      Loss from Operations: Loss from operations was $233.7 million for the full year fiscal 2024, compared to a loss from operations of $346.7 million in the yearago period. Non-GAAP income from operations was $270.4 million, compared to a non-GAAP income from operations of $62.0 million in the year-ago period.

●      Net Loss: Net loss was $176.6 million, or $2.48 per share, based on 71.2 million weighted-average shares outstanding, for the full year fiscal 2024. This compares to a net loss of $345.4 million, or $5.03 per share in the year-ago period. Non-GAAP net income was $274.2 million or $3.33 per share based on 82.4 million diluted weighted-average shares outstanding. This compares to a non-GAAP net income of $64.7 million or $0.81 per share in the year-ago period.

●      Cash Flow: During the year ended January 31, 2024, MongoDB generated $121.5 million of cash from operations, compared to $13.0 million of cash used in operations in the year-ago period. Free cash flow for the year ended January 31, 2024 was $109.9 million, compared to negative free cash flow of $24.7 million in the year-ago period.

<u>First Quarter and Full Year Fiscal 2025 Guidance</u>

Based on information available to management as of today, March 7, 2024, MongoDB is issuing the following financial guidance for the first quarter and full year fiscal 2025. guidance reflects the impact of over $80 million of FY24 revenue, related to multi-year term licenses and unused Atlas commitments, that we do not expect to realize in FY25.

| | **First Quarter Fiscal 2025** | **Full Year Fiscal 2025** |
|---|---|---|
| **Revenue** | $436.0 million to $440.0 million | $1.90 billion to $1.93 billion |
| **Non-GAAP Income from Operations** | $22.0 million to $25.0 million | $186.0 million to $201.0 million |
| **Non-GAAP Net Income per Share** | $0.34 to $0.39 | $2.27 to $2.49 |

39.    The Company held a call for analysts and investors later that same day. During the call, Defendant Ittycheria focused on the prior fiscal year's results in his opening remarks:

> Today, the vast majority of AI spend is happening in the first layer, that is investments in compute to train and run LLMs, neither are areas in which we compete. Our enterprise customers today are still largely in the experimentation and prototyping stages of building their initial AI applications, first focused on driving efficiencies by automating existing workloads. We expect that will take time for enterprises to deploy production workloads at scale. However, as organizations look to realize the full benefit of these AI investments, they will turn to companies like MongoDB, offering differentiated capabilities in the upper layers of the AI stack.

40.    Defendant Gordon stated in his opening remarks:

> Let's start with Atlas. Atlas grew 34% in the quarter compared to the previous year and now represents 68% of total revenue, compared to 65% in the fourth quarter of fiscal 2023 and 66% last quarter. We recognize Atlas revenue primarily based on

customer consumption of our platform, and that consumption is closely related to end-user activity of the application

\*     \*     \*

Turning to customer growth. During the fourth quarter, we grew our customer base by approximately 1,400 customers sequentially, bringing our total customer count to over 47,800 which is up from over 40,800 in the year ago period. Of our total customer count, over 7,000 are direct sales customers which compares to over 6,400 in the year ago period. The growth in our total customer count is being driven primarily by Atlas, which had over 46,300 customers at the end of the quarter, compared to over 39,300 in the year ago period. It's important to keep in mind that the growth of our Atlas customer count reflects new customers to MongoDB in addition to existing EA customers adding incremental Atlas workloads.

41.    Defendant Gordon then remarked on the provided guidance for fiscal year 2025:

I'll now provide some more context on our guidance, starting with the full year fiscal '25 where we're facing difficult compares in 2 ways. First, we expect to recognize close to 0 revenue from unused Atlas commitments in fiscal '25 compared to over $40 million in fiscal '24. As you may recall, in fiscal '24, we changed our sales incentive structure to reduce the importance of upfront commitments, and so we saw far fewer upfront commitments. Therefore, as those fiscal '24 deals come up for renewal in fiscal '25, we expect to see limited revenue related to unused commitments.

Second, in fiscal '24, we recognized approximately $40 million more in multiyear license revenue than we did in fiscal '23. As you know, our fiscal year '24 non-Atlas revenue benefited from a higher than-usual amount of license revenue related to pay year contracts, including our extended partnership with Alibaba. Clearly, we are pleased with the fiscal '24 performance, but it was unusual in terms of the magnitude of multiyear deals and we don't expect similar performance in fiscal '25. As a result, we expect non-Atlas revenues to be modestly down in fiscal '25. Next, we expect Atlas consumption growth to be in line with the consumption growth we've experienced in fiscal '24.

\*     \*     \*

Moving on to our Q1 guidance, a few things to keep in mind. First, we expect Atlas revenue to be flat to slightly down sequentially. Q1 has 2 fewer days than Q4 this year, which represents a revenue headwind. Also the slower Atlas consumption growth during the holidays will have a bigger impact on Q1 revenue than it did in Q4, thereby negatively impacting sequential revenue growth. Finally, the sequential impact from the expected decline in unused Atlas commitments will be most pronounced in Q1, given that we made the changes in Q1 of last year.

Second, we expect to see a meaningful sequential decline in EA revenue. As discussed in past years, Q4 is our seasonally highest quarter in terms of our EA renewal base which is an excellent indicator of our ability to win new EA business. In Q1, the EA renewal base is sequentially much lower.

Finally, we expect operating income to decline sequentially due to lower revenue as well as our increased pace of hiring.

42.    During the question-and-answer portion of the call, Defendants Ittycheria and

Gordon were asked at length about the Company's projections:

<Q: Raimo Lenschow - Barclays Bank PLC - Analyst> Congrats on a nice Q4. A question also a little bit on guidance. Mike, the last few quarters before Q4, we talked about EA seeing a little bit of a tailwind from customers kind of maybe modernizing on premise rather than doing to Atlas to kind of still modernize but maybe not spending all the money to go to the cloud. Is that trend still valid? And if you think about the multiyear commitments, obviously, you had, what, 10 million, 15 million for the Alibaba deal. But then the other stuff is like customers that are just doing this work. Do you think that will change and people go back to like shorter commitments? Or is it just more that you're kind of thinking about the renewal pool.

<A: Michael Lawrence Gordon> Yes. So a few different things embedded in there. On the multiyear, we've -- it's always been a dynamic. And as we've seen deals or variability, we've tried to call that out and that's why we sort of call out, given under the ASC 606 that increased variability and reduced comparability that comes from EA. Obviously, Atlas has grown as a percentage of the business, but that continues to be the dynamic for the EA portion. I expect that we will continue to see multiyear deals, but we just -- in fiscal '24, it was just so many more than we thought. And to your point, not just EA, but broadly nonAtlas. And it's just -- it's not something that will repeat in fiscal '25. And so that's why we wanted to call it out and quantified it.

*    *    *

<Q: Kasthuri Gopalan Rangan - Goldman Sachs Group, Inc. - Head of Software Coverage> Congrats on the results. One quick one for Dev and one hopefully will go to Michael as well . . . One for Michael. In your assumptions, when I take away the $40 million of the upfront, I mean, that's like a couple of percentage points of growth. I'm just trying to understand what kind of consumption trends you are using to build guidance? Was it average of fiscal '24 consumption trends or weighted more towards second half or exiting fourth quarter? Any color there would be tremendously useful.

<p style="text-align:center">*     *     *</p>

&lt;A: Michael Lawrence Gordon&gt; And then on the consumption questions, Kash, thanks for that. Overall, if you look at the guidance and the piece parts that we've tried to share with you, when you take into account the $80 million of impact from the unused commitments and the multiyear outperformance, you'll see at the top line level around 500 basis points of a headwind. And then we also walked you through our expectations that the non-Atlas will be modestly down, given the $40 million of that part that isn't recurring. So when you kind of piece all those together, you'll wind up probably coming to a conclusion that Atlas looks consistent from a consumption growth standpoint. And that's in line with the stable trends we've seen over the course of fiscal '24, so we're using those fiscal '24 numbers. (Emphasis added.)

Obviously, there's some seasonal adjustments that we have factored in there, but that's really what we're seeing there.

<p style="text-align:center">*     *     *</p>

&lt;Q: Bradley Hartwell Sills - BofA Securities - Director, Analyst&gt; I wanted to ask a question around the sales capacity. It sounds like at some point last year, you realized that you had underinvested, maybe pivoted too much towards margin expansion and then are now catching up. In the guidance, if you could assume you had the sales capacity that you would prefer to be at this point given the demand that you're seeing, would we be at a higher level of growth? I'm just trying to parse out how much of the guide is factoring in those constraints on sales capacity that you've talked about. (Emphasis added.)

&lt;A: Dev C. Ittycheria&gt; Yes. So thanks for your question. Yes, given the macro uncertainty, especially coming out off Q4 of last year, we did slow down hiring quite meaningfully. And obviously, that showed up in our numbers, to the point that Michael talked about in our op margin as well. We obviously know that we have a big opportunity in front of us. So we are growing our head count between the mid- and high teens. We think that's appropriate relative to the opportunities we see. And yes, if we had more productive sales capacity, the guidance would probably be higher. There's no question about that.

43.     Defendant Ittycheria also commented on the reasons behind the provided guidance

for fiscal year 2025:

In summary, we expect the environment in fiscal '25 to be largely similar to the environment we experienced in fiscal '24.

<p style="text-align:center">17</p>

<p style="text-align:center">*     *     *</p>

[W]e are focused on growing sales capacity. As we told you in the past, we are slow to grow capacity in fiscal '24, especially in the first half due to macro uncertainty. Given that the market is more stable now and that we remain underpenetrated compared to our opportunity, we'll increase the pace of go-to-market investments in fiscal '25.

<p style="text-align:center">*     *     *</p>

Let me wrap up by saying that I remain highly confident about our ability to execute on our long-term growth opportunity. We are pursuing one of the largest and fastest-growing markets in all of software, with significant expansion opportunities in both new and existing customer accounts. While it's early days, we expect that AI will not only support the overall growth of the market, but also compel customers to revisit both their legacy workloads and build more ambitious applications. This will allow us to win more new and existing workloads and to ultimately contribute to establish MongoDB as a standard in enterprise accounts.

44.     Defendant Gordon also attempted to explain away the provided guidance for fiscal year 2025:

I'll now provide some more context on our guidance, starting with the full year fiscal '25 where we're facing difficult compares in 2 ways. First, we expect to recognize close to 0 revenue from unused Atlas commitments in fiscal '25 compared to over $40 million in fiscal '24. As you may recall, in fiscal '24, we changed our sales incentive structure to reduce the importance of upfront commitments, and so we saw far fewer upfront commitments.

Therefore, as those fiscal '24 deals come up for renewal in fiscal '25, we expect to see limited revenue related to unused commitments.

Second, in fiscal '24, we recognized approximately $40 million more in multiyear license revenue than we did in fiscal '23. As you know, our fiscal year '24 non-Atlas revenue benefited from a higher-than-usual amount of license revenue related to pay year contracts, including our extended partnership with Alibaba. Clearly, we are pleased with the fiscal '24 performance, but it was unusual in terms of the magnitude of multiyear deals and we don't expect similar performance in fiscal '25.

As a result, we expect non-Atlas revenues to be modestly down in fiscal '25. Next, we expect Atlas consumption growth to be in line with the consumption growth we've experienced in fiscal '24.

<p style="text-align:center">18</p>

45.    When questioned about whether the Company expected fiscal year 2025 to be like the previous year, where the projected financial results were less than the actual financial results, Defendant Gordon stated:

> <Q: Brent Alan Bracelin - Piper Sandler & Co. - MD & Senior Research Analyst> Michael, we're going to stick with the guide seen here. If I look at last year, you guided to, I think, 16% growth. You ended up doing 31% for the full year. Even if I take out the $80 million tailwind, you talked about, that's still 25% growth. You're guiding to 14% growth this year, again 5% headwind, so closer to 19% organically.
>
> Are you more confident kind of going into this year than last year just as you think about the trends? Is the 14% comparable to the 16% initial guide last year? Is it really more like 19% adjusted basis comparing to 16%? I know it's a little confusing, but getting a lot of questions on it.
>
> <A: Michael Lawrence Gordon> Yes. No, it's fine. I go back to what I said in response, I think it was to Sanjeet's question. There's been no fundamental change or approach in terms of how we're looking and determining our guidance. I do think to the confidence point, I think that, that is correct. We do have more confidence. We have more data. We -- if you think back a year ago, as one of the questions indicated, there was much more macro uncertainty. I think over the course of fiscal '24, we saw narrower variability. We saw more consistent results that does give us increased confidence. I think we also have another year under our belt in terms of understanding the seasonality trends of Atlas.
>
> I know Atlas is a big business, but it's still a relatively young one, especially when you think about giving quarterly data points. And so I think we have more confidence and better handle on that. And then lastly, while there is a difficult compare on EA -- I think we talked about this in the second half of last year where we were -- at some point, you could only be -- continue to be surprised by EA so much. And so as we looked at our – I think it was in our third quarter call, we talked about how we were upping our views on what EA could do. And so all that's sort of baked into the guide.

46.    Investors and analysts reacted negatively to the updated guidance. The Company's stock price dropped from a close of $412.01 per share on March 7, 2024, to a close of $383.42 per share on March 8, 2024.

47.    The foregoing statements were materially false and misleading, failing to disclose materially adverse facts about the Company's business and operations. Specifically, the

Defendants led stockholders to believe that they possessed reliable information about the Company's projected revenue outlook and anticipated growth. Defendants failed to disclose that the rosy revenue projections did not take into account the impact of restructuring of the sales force, which had led to a complete loss of upfront commitments, the sales force could not predict an outlook for new Atlas enrollments, and had reduced pressure on obtaining new enrollments.

### C.    The Truth is Revealed

48.    In the evening of May 30, 2024, MongoDB issued a press release announcing the financial results for the first quarter of fiscal year 2025. The press release included the following update on projections for the remainder of fiscal year 2025:

**Second Quarter and Full Year Fiscal 2025 Guidance**

Based on information available to management as of today, May 30, 2024, MongoDB is issuing the following financial guidance for the second quarter and full year fiscal 2025.

|  | Second Quarter Fiscal 2025 | Full Year Fiscal 2025 |
|---|---|---|
| **Revenue** | $460.0 million to $464.0 million | $1.88 billion to $1.90 billion |
| **Non-GAAP Income from Operations** | $35.0 million to $38.0 million | $168.0 million to $183.0 million |
| **Non-GAAP Net Income per Share** | $0.46 to $0.49 | $2.15 to $2.30 |

49.    That same day, the Company held a call for investors and analysts. Defendant Ittycheria stated the following in his opening remarks:

Let me go into our quarterly results in a bit more detail. First, Atlas consumption growth was below our expectations in the first quarter. We saw less seasonal improvement than expected, and this dynamic was true with customers across tenure, industry, size and geography. We believe this indicates a more challenging macro environment than expected at the beginning of the year.

A new dynamic we saw in Q1 was the growth rate of more recently acquired workloads started to slow down earlier than expected. While the macro environment had an impact, we also believe this is partly due to the go-to-market changes we instituted last year. We have fine-tuned our process and incentive structures to make sure the field is focused on winning workloads with higher growth potential.

Second, our new business performance in Q1 wasn't up to our standards. Operationally, we got off to a slow start in the quarter. And while we mostly caught up on new business as the quarter went on, we didn't quite get there in the end.

50.    Defendant Gordon stated in his opening remarks:

[A]s we communicated last quarter, Q1 was the first quarter we saw the expected significant decline in revenue from unused Atlas commitments, making this quarter a tough comparison, both sequentially and year-over-year.

51.    Defendant Gordon then explained the reduced guidance for the remainder of fiscal

year 2025:

I'll now provide some more context around our guidance, starting with the full year. First, as a reminder, our fiscal '25 Atlas revenue growth rate will be impacted by the absence of over $40 million in revenue related to unused customer commitments.

Second, we had expected Atlas consumption growth to be stable in fiscal '25 relative to fiscal '24. But after a weaker-than-expected Q1, we now expect Atlas consumption growth to slow down this year. The slowdown is driven by the more pronounced macro impact we are seeing on our existing workloads, recent cohorts in particular. In addition, starting Q2 Atlas ARR is also lower in part because of the smaller-than-expected new business cohort in Q1.

Third, we previously expected non-Atlas revenues to be modestly down in fiscal '25. As a reminder, in fiscal '24, we recognized approximately $40 million more in multiyear license revenue than we did in fiscal '23, making for a difficult compare this year. We had expected fiscal '25 multiyear license revenue contribution to be more in line with fiscal '23. However, in Q1, despite the EA outperformance, we saw a lower-than-expected contribution from multiyear deals, and our a pipeline of multiyear deals for the rest of the year is currently lower given the macro

environment. Consequently, we now expect non-Atlas revenue to be down mid-single digits for the year.

52.     The analysts attending the call questioned the rationale for the updated guidance

and the disclosed financial results:

<Q: Sanjit Kumar Singh - Morgan Stanley - Vice President> Understood. And then just one quick follow-up on the sales side. You mentioned that sort of the recently acquired workloads were not growing as fast as expected, and you seem to point that as related to some sales execution opportunities. Could you unpack that for us as to like why that may be an issue? Once the customer sort of onboards the new workload, what's the sort of responsibility of sales to grow that? I would imagine that once you stand up that work case, it's sort of driven by the nature of the application. So I just want to understand the new workload that can [indiscernible].

<A: Dev C. Ittycheria> Yes, I just want to -- I think there's actually 2 separate issues. One is we're talking -- when we talk about workloads slowing down or growing more slowly, we're talking about the workloads predominantly from last year and before. We had a record workload volume last year, and we purposely designed our incentive system to reduce the friction to acquire workloads, and that actually worked really well.

What we're seeing is that now as we're starting to hit the 1-year mark for the first workloads required last Q1 that they're growing more slowly. So we're changing and finetuning some of the incentives to ensure that our salespeople and our teams focus on higher quality workloads that have higher growth potential. That's -- so that's one point. In terms of new business, we did have a slow start to the year.

As you know, we really focused on acquiring new workloads and measuring workloads all last year, so it took some time for us to analyze that workload data and that then delayed how we organize from an org structure or territory and ultimately finalizing quotas. And so we did almost catch up by the end of the quarter but not fully. But I want to be clear, we remain very confident in our ability to win new business, and our win rates remain strong.

*        *        *

<Q: Raimo Lenschow - Barclays Bank PLC - Analyst> Can I stay on that subject, Dev, a little bit? So if you think about the -- some of the stuff you just talked about is kind of in your own control and then there is macro, like if you think about like what was the more important driver here than macro side or the side that kind of you influence, can you speak to that, like that we try to understand that better? And when did macro show up for you as well in -- during the quarter?

<A: Dev C. Ittycheria> I would say, obviously, based on expectations, the macro was -- the consumption was worse than we had expected when we guided at the end of Q4 based on our Q4 results. And the reason we firmly believe there's a macro impact is because we saw that slowdown happen across different sizes of customers, across different industries, across different geos and also across the tenure of our customers.

There's also -- the usage growth was definitely slower compared to a year ago period. So that's what gives us a belief that this was a macro issue. And then the new business issue was really -- as I said, we almost caught up, but it was really operationally getting our organization in place and quotas in place, and we definitely learned from that and we have changed our planning process so that we don't repeat the same mistake again. But that was the execution issue that I would say that we went through in Q1 with a slower start to the year.

<center>*     *     *</center>

<Q: Brad Robert Reback - Stifel, Nicolaus & Company, Inc. - MD & Senior Equity Research Analyst> Great. And on the volume versus potential of deals, we'll say, or workloads, as you talked about last year, a lot of volume, maybe the potential wasn't as high to -- for those workloads to grow. Can you give us a sense of the types of workloads that weren't growing as fast? Or what gives you confidence that you've really identified those types of workloads that can get you back to high potential?

<A: Dev C. Ittycheria> Yes. I mean the initial workloads actually grew in line with what we were expecting, but then they started growing more slowly. And we really noticed this quarter. I would say, while it's not easy to identify, especially new workloads, what's going to take off versus what's going to be more of a slower growth workload because sometimes even customers don't know, what we have done is changed incentive systems a bit to emphasize more quality of workloads in the sales comp plans. So by definition, they're very incentivized to really push for the higher-growth workloads, and they can get -- not perfect data but a lot better data by working more closely with customers to understand which are more of the critical workloads versus more of the tertiary workloads.

<A: Michael Lawrence Gordon> And maybe, Brad, just to sort of connect the dots just to make sure that everyone's following is that as we successfully got more volume, right, because we've got low share in this big market, one of the things that we did that helped us do that is reduce friction upfront. An unintended consequence of reducing friction is you actually have less information about everything, right? So if you're a sales rep and you're trying to prioritize your time, that was an unintended consequence. So what Dev is talking about will help address that.

<Q: Karl Emil Keirstead - UBS Investment Bank - Analyst> . . . Maybe I'll direct these to Dev. Dev, I know it's hard to get into the heads of your customers and

understand their behavior. But I guess the spirit of this question is when you say macro, what do you mean exactly. What are the customers telling you is the root cause? Is it a sensitivity to rates or consumer, end market weakness? Are you able to pinpoint what it is? And then maybe part 2, 1 easy alternative explanation to macro is that AI has become such a big issue for CIOs and boardrooms that it might be crowding out other spend.

Do you feel like there's any credence to that thesis?

<A: Dev C. Ittycheria> Yes. So thanks for the question, Karl. So when we talk about macro, remember, ultimately, we're a database or a data platform, and the usage of our platform is directly or very tightly correlated to the performance of the end customer's business. If they're selling 100 widgets a week and all of a sudden, now they're selling 80 widgets a week, that will mean that they're using the database less intensely.

So when we see broad-based slowdown across different customer cohorts of different sizes across different industries and across different geos, that strikes us as pretty much a macro issue. And so that's why based on -- and we have close to 50,000 customers, so we have a pretty good feel for what's happening right now, and that's why we feel that there's definitely a macro element to it.

With regards to the second part of your question, is AI essentially crowding out new business, we definitely think that that's plausible. We definitely see development teams experimenting on AI projects. The technology is changing very, very quickly. But that being said, we don't see that as a reason for us to not hit our new business targets. And as I said, even though we started slow, we almost caught up at the end of this quarter, and we feel really good about our new business opportunity for the rest of this year. So I don't want to use that as excuse for us not meeting our new business targets. . . .

<Q: Tyler Maverick Radke - Citigroup Inc. - VP & Senior Analyst> . . . And Michael, on the guidance here, obviously, I'm sure you don't like lowering guidance, but considering you did it here, and hopefully, this is the last time this year, can you just remind us what you're assuming from a consumption pattern? I know you said that this year is obviously starting off slower than you expected and kind of behind seasonal trend versus last year. Like what are you doing from an adjustment perspective? Are you taking kind of a worst case scenario? Are you looking back maybe a couple of years back when consumption trends were even worse? Just help us understand what's embedded and what level of conservatism you're applying.

<A: Michael Lawrence Gordon> Yes. So happy to help you walk through. Obviously, we went through the fiscal '25 guide in a fair amount of detail when we guided back in March. And so maybe I'll kind of call out the things that have changed since then in terms of our understanding, obviously, first and foremost, the

Q1 results being the biggest piece. So as we've talked about consumption and consumption growth and consumption growth trends tend to be the biggest near-term factor when you look out at the business. So we saw those lower, as we mentioned, in March and April than what we expected. May, as I mentioned, is consistent with that. And so we've assumed that same level persists throughout the year. So we haven't assumed a recovery and nor have we assumed a deterioration.

And then the other thing within Atlas that's important to keep in mind, as you think through kind of the impacts are in part because of that lower expansion in Q1 and then also the smaller new business cohort within Atlas in Q1, the starting Q2 ARR is lower, and that compounds over the course of the year, right? So we spent a bunch of time last year talking about how Q1 was a particularly strong quarter. And given the math of compounding, that wound up being the gift that kept giving throughout the year from an absolute revenue number perspective, even if we saw different consumption trends. That will work the same way this year but sort of in reverse, right, with the softer growth in Q1, that will compound, as you think about it, relative to your full year guide. And so that's baked in to the math and the equation.

And the third thing that I'd call out is I referenced EA. EA did have a stronger Q1 and outperformed relative to our expectations. But despite that outperformance, we actually saw fewer multiyear deals. And in the current macro environment, when we look out, we think there's reason to believe that Q1 wasn't a fluke and that, that will be a headwind. And so when you think about the 606 dynamics associated with Enterprise Advanced, we factored that into account as well. And so those are really the 3 key things that make up the inputs into the fiscal '25 updated guide.

\*       \*       \*

<Q: Michael Joseph Cikos - Needham & Company, LLC - Senior Analyst> I have 2, and I'll start with the first 1 here just to be clear, but I want to make sure I'm interpreting this properly. On the slower growth from those newly acquired workloads last year, is the takeaway that the sales team wasn't necessarily acquiring the "right type of workload" because MongoDB, it sounds like it is over-indexed toward focusing on the volume of these newly acquired workloads over quality. Is that a fair characterization or takeaway from what we're hearing today?

<A: Dev C. Ittycheria> Potentially. I mean I would say that we obviously have learned a lot. And so we really indexed on volume because, as in past years, when you have a portfolio of workloads, you're not sure which workload is going to take off, and that's been the growth driver of our business. And I'll just remind you, 5 years ago, we were 1/10 of the size of our business today, so that's -- our strategy has been to acquire workloads as quickly as possible, and we want to be -- make it even easier for customers to -- for us to win workloads, so customers could use our platform. It's just that as we see the growth rates of the workloads that are more recently acquired, they seem to be growing a little slower than we expected.

And so we're just making some refinements. I don't want to suggest that this is a major pivot or kind of change in direction. It's just some major -- some refinements in terms of our incentive system to reward salespeople for workloads that grow even -- that grow fast. And so -- and that's -- we think that's the appropriate response here.

<Q: Michael Joseph Cikos - Needham & Company, LLC - Senior Analyst> Got it. And I think my follow-up, again, I'm trying to get this from the outside in, but I'd appreciate any color. Like understand the refinement here on looking at those workloads to grow faster, but I think Michael had made the earlier point as well that because of this go-to-market effort, you almost by default have less visibility into that customer because you have reduced the friction to adopt. So can you help me think about how you guys are refining that focus on acquiring those right workloads just given that reduced visibility we have?

                              *       *       *

<A: Michael Lawrence Gordon> The other thing, Mike, just not to get lost in the details, but I wouldn't quite use the word visibility. But I do think if you think about it this way, if you're going through the process of negotiating a commitment with the customer, you're going to get an enormous amount of information from that customer about the workload and about everything else. And so when you're moving in a frictionless manner to get more workloads, you won't get all of that information.

It's still possible with intent and purpose and incentives to get some of that information. And getting that little bit of relevant information is dramatically different than getting a commitment, right? And so that's the balance that we're just -- we're trying to strike and that we're continuing to iterate as we learn here.

<A: Dev C. Ittycheria> Yes. And also I just want to add, it's not that we're anti commitments. We want to -- the customer to feel like, okay, I see enough volume either through this one workload or through the multitude of workloads they have to make a bigger commitment. And it's a much more natural conversation than trying to prematurely force a commitment when the customer themselves may not know how quickly that workload is going to grow. And so consequently, we'll struggle to figure out like what kind of commitment they want to sign up for.

    53.    Investors reacted promptly to these revelations. The price of MongoDB's common

stock declined dramatically, from a closing price of $310.00 per share on May 30, 2024 to $236.06

per share on May 31, 2024, a decline of nearly 24% in the span of one day.

**D.      Defendants' Misconduct Has and Continues to Harm the Company**

54.      As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *Baxter v. MongoDB, Inc., et al.*, Case No. 1:24-cv-05191 (S.D.N.Y), as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

55.      MongoDB's reputation and goodwill have also been damaged by the Defendants' misconduct.

**E.      MongoDB Issues a False and Misleading Proxy Statement**

56.      In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period, the Schedule 14A Proxy Statement issued on May 16, 2024 (the "2024 Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

57.      The Director Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy before it was filed with the SEC and disseminated to MongoDB's stockholders. The Director Defendants negligently issued materially misleading statements in the 2024 Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies allegations and related claims.

58.      The 2024 Proxy was solicited by the Director Defendants and called for the Company's shareholders to vote to, inter alia: (1) re-elect Defendants Botha, Ittycheria, and

Lewnes to the Board; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year.

59.     In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

*Board of Directors Risk Oversight*

Our board of directors is responsible for, and committed to, the oversight of our long-term strategic plan and significant enterprise-wide risks. In carrying out this responsibility, our board of directors applies an enterprise-wide approach to risk management. This approach is designed to support organizational objectives, such as short- and long-term strategic objectives and enhancement of stockholder value. A fundamental part of risk management is not only understanding the most significant risks a company faces and what steps management is taking to manage those risks, but also understanding what level of risk is appropriate for a given company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.

In connection with its reviews of the operations of our business, our board of directors addresses the primary risks associated with our business including, for example, strategic planning, liquidity risk, organizational risk and operational risk.

Our board of directors appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge.

*Committee Risk Oversight*

Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through our board of directors as a whole, as well as through various standing committees of our board of directors that address risks inherent in their respective areas of oversight. Our board of directors regularly reviews information regarding our operational, financial, legal, data security and strategic risks. Additionally, senior risk management personnel attend quarterly meetings of our board of directors, provide presentations on operations including significant risks, and are available to address any questions or concerns raised by our board of directors.

In particular, our audit committee has the responsibility to consider and discuss our major financial and security risk exposures and the steps our management has taken to monitor and mitigate these exposures, including guidelines and policies to

govern the process by which risk assessment and management is undertaken. Our audit committee also monitors compliance with legal and regulatory requirements. Our audit committee further oversees initiatives related to cybersecurity, including prevention of attacks and monitoring of our systems, as well as our Enterprise Risk Management program. In addition, among other matters, management provides our audit committee periodic reports on our compliance programs and investment policy and practices.

Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. The compensation committee also oversees risks relating to the recruiting and retention of our executive officers and our broader compensation philosophy.

Our nominating and corporate governance committee monitors the effectiveness of our Corporate Governance Guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. The nominating and corporate governance committee also assists the board of directors in monitoring our governance and board of directors' succession risks.

At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as competition risks, legal risks, information security and privacy risks, and financial, tax and audit related risks.

60.     The 2024 Proxy Statement also stated:

**Code of Business Conduct and Ethics and Corporate Governance Guidelines**

We have adopted a Code of Business Conduct and Ethics that applies to all of our directors, officers and employees. We plan to disclose any future amendments to certain provisions of our Code of Business Conduct and Ethics, or waivers of such provisions applicable to any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, and our directors, on our website. Our board of directors has also adopted Corporate Governance Guidelines that establish the corporate governance policies pursuant to which our board of directors conducts its oversight of the business of MongoDB in accordance with its fiduciary responsibilities. Our Code of Business Conduct and Ethics, applicable amendments thereto and waivers thereof, and our Corporate Governance Guidelines are available in the "Corporate Governance" section of our investor relations website at investors.mongodb.com.

61.     The 2024 Proxy thus assured stockholders that the Director Defendants understood

Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken

to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning MongoDB's projected revenues and growth for fiscal year 2025 and the impact thereon from the restructuring of the sales force.

62.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**F.    The Board Breached its Fiduciary Duties**

63.    As officers and/or directors of MongoDB, the Defendants owed MongoDB fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage MongoDB in a fair, just, honest and equitable manner. The conduct of the Defendants involves a knowing or reckless violation of their obligations as directors and officers of MongoDB, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

64.    Defendants, because of their positions of control and authority as directors and/or officers of MongoDB, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding MongoDB's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

65.     To discharge their duties, the officers and directors of MongoDB were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and MongoDB were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)     Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)     Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to

correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)      Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)      Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

66.     The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

67.     The Board's Audit Committee is tasked with overseeing MongoDB's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of MongoDB's internal controls over financial reporting and its disclosure controls and procedures. Specifically, the Audit Committee's charter states the following in regards to Audit Committee's purpose and responsibilities:

• help the Board oversee MongoDB's corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits;

• manage the selection, engagement terms, fees, qualifications, independence, termination, and performance of the registered public accounting firms engaged as MongoDB's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

• review any reports or disclosures required by applicable rules and regulations of the Securities and Exchange Commission (the "SEC") and the Nasdaq listing standards;

• oversee the organization and performance of MongoDB's internal audit function; and

• provide regular reports and information to the Board with respect to material issues and, in the context of risk assessment and management, compliance with legal and regulatory requirements. The Committee will maintain and foster an open avenue of communication with MongoDB's management, internal audit and Auditors. It will also be responsible for any additional duties and responsibilities that the Board mandates.

\* \* \*

Responsibilities:

The Committee will oversee MongoDB's financial-reporting process on behalf of the Board and will have direct and sole responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for MongoDB. The Auditors and any other registered public accounting firm engaged for the financial reporting process will report directly to the Committee and be accountable to it. The Committee's responsibilities are a guide and should remain flexible to account for changing circumstances and needs. The Committee may supplement its duties as appropriate and establish policies and procedures consistent with applicable rules and regulations. The Committee shall have the following responsibilities[.]

\* \* \*

*Auditor Management*

**1. Hiring and Selecting Auditors.** The Committee will evaluate, determine whether to retain and determine the fees of any Auditors and any other registered public accounting firm engaged for the financial reporting process. In addition, the Committee may replace any existing Auditors with a different public accounting firm.

**2. Approving Audit and Non-Audit Engagements.** The Committee will review audit plans, the adequacy of staffing, the fees to be paid to Auditors, and oversee the negotiation and execution of any engagement letters on behalf of MongoDB. The Committee will oversee the rotation of the Auditors' partners on MongoDB's audit engagement team as required by

applicable rules and regulations. The Committee will approve all audit and non-audit related services that the Auditors provide to MongoDB before the engagement begins, unless applicable rules and regulations allow otherwise. The Committee may establish pre-approval policies and procedures but may delegate pre-approval authority to one or more Committee members as permitted by applicable rules and regulations, provided that such designees present any such approval to the full Committee at the next Committee meeting.

**3. Auditor Independence.** At least annually, the Committee will assess the qualifications, performance, and independence of the Auditors, or in the case of prospective Auditors, before they are engaged. That assessment will include reviewing written disclosures from any Auditors regarding any relationships they have that may affect independence, as defined by applicable rules and regulations. The Committee will review a formal written statement from any Auditors affirming their independence, and assess, consider, and discuss with them any potential relationships concerning their objectivity and independence.

<p align="center">*      *      *</p>

*Financial Review and Disclosure*

**5. Annual Audit Results.** The Committee will review with MongoDB management and the Auditors the results of the annual audit, including:
> • the Auditors' assessment of the quality of MongoDB's accounting principles and practices;
> • the Auditors' views about qualitative aspects of MongoDB's significant accounting practices, the reasonableness of significant judgments, and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements);
> • all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);
> • the adequacy of the disclosures in the financial statements; and
> • any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

**6. Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements and quarterly financial statements with MongoDB management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in MongoDB's Annual Report on Form 10-K.

**7. Earnings Announcements**. The Committee will review and discuss with MongoDB management and the Auditors any earnings press releases and other financial information regarding MongoDB's results of operations.

**8. Proxy Report.** The Committee will oversee the preparation of any report of the Committee required by applicable rules and regulations to be included in MongoDB's annual proxy statement.

**9. Accounting Principles and Policies.** The Committee will review and discuss with MongoDB management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

> • critical accounting policies and practices and any critical audit matters discussed during the audit;
> • alternative accounting policies available under GAAP;
> • critical audit matters arising from the current period audit; • the potential impact on MongoDB's financial statements of alternative treatments; and
> • any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on MongoDB's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and MongoDB management, if appropriate, any written communication, such as any management letter or internal-control letter, and monitor management's response to such communications. At least annually, the Committee will discuss with the Auditors the matters required to be discussed with the Auditors under applicable requirements of the Public Company Accounting Oversight Board ("PCAOB") and the SEC.

**10. Management Cooperation with Audit.** The Committee will evaluate MongoDB management's cooperation with the Auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any. The Committee will resolve any conflicts or disagreements between MongoDB management and the Auditors regarding financial reporting.

*Internal Control and Procedures*

**• Risk Assessment and Management.** The Committee will review and discuss with MongoDB management and the Auditors MongoDB's policies on financial risk management and assessment. The Committee will provide regular reports to the Board about material issues affecting the quality or integrity of MongoDB's financial statements, compliance with legal or regulatory requirements, the performance or independence of the Auditors,

the performance of MongoDB's internal audit function, and other matters as the Committee deems appropriate.

• **Internal Auditors.** The Committee will review the audit plan of MongoDB's Internal Audit team and discuss with that team the adequacy and effectiveness of MongoDB's scope, staffing, and general audit approach. The Committee will review any significant reports prepared by MongoDB's internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Committee.

• **Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with MongoDB management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and MongoDB's disclosure controls and procedures. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

• **Correspondence with Regulators.** The Committee will consider and review with MongoDB management, the Auditors, and outside advisors or accountants at least annually any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding MongoDB's financial statements or accounting policies.

• **Internal Control Report.** At least annually, the Committee will review a report by the Auditors describing any material issues raised by (i) that firm's internal quality-control review, (ii) any peer review or PCAOB review of the firm's internal quality-control review, or (iii) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors. As part of this annual review, the Auditors' report will also describe any steps taken to address the issues raised.

68.    In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Botha, Cochran, and Hazard conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and

misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

69.     In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

70.     The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on MongoDB.

71.     Additionally, the Board has a Nominating and Corporate Governance Committee with the following purpose and responsibilities:

**Purpose:**

●     help the Board oversee MongoDB's corporate governance functions and develop, update as necessary and recommend to the Board the governance principles applicable to MongoDB;

●     identify, review, evaluate and recommend and communicate with candidates qualified to become Board members or nominees for directors of the Board consistent with criteria approved by the Board; and

- make other recommendations to the Board relating to the directors of MongoDB.

<div align="center">*      *      *</div>

**Responsibilities:**

**1. Director Nominations.** The Committee will identify and evaluate candidates, including nomination of incumbent directors for reelection and nominees recommended by stockholders to serve on MongoDB's Board. The Committee will use criteria approved by the Board, including consideration of the potential conflicts of interest, director independence, experience, diversity, age, skills and other factors it deems appropriate as set forth in the Company's Corporate Governance Guidelines, as in effect from time to time (the "Guidelines"). The Committee will monitor and evaluate the composition, organization, and size of the Board. The Committee will also have the power and authority to establish any policies, requirements, criteria, and procedures, and will make such recommendations to the Board. The Committee's power and authority includes establishing policies and procedures to facilitate stockholder communications with the Board. The Committee will also have the power and authority to make any disclosures required by applicable law in the course of exercising its authority.

**2. Board and Management Assessment.** The Committee will periodically review the performance of the Board, including (together with such committees) the Board committees, seeking input from management. As appropriate, the Committee will make recommendations to the Board for areas of improvement. The Committee will also consider the independence of directors and the requirements imposed by the SEC and Nasdaq.

<div align="center">*      *      *</div>

**5. Corporate Governance Principles.** The Committee will develop and evaluate the Guidelines and periodically review and assess MongoDB's corporate governance, and, as appropriate, will recommend changes to the Board for its consideration.

**6. Procedures for Information Dissemination.** The Committee will periodically review the processes and procedures used by MongoDB to provide information to the Board and its committees and make recommendations to the Board and management for improvement as appropriate. The Committee should consider, among other factors, the reporting channels through which the Board and its committees receive information and the level of access to outside advisors where necessary or appropriate, as well as the procedures for providing accurate, relevant and appropriately detailed information to the Board and its committees on a timely basis.

72.     Defendants D'Souza, Hazard, and Killalea have failed to fulfill these responsibilities by failing to oversee the Board whose members knowingly made material misrepresentations and omission concerning the Company's business and financials. These Defendants were also specifically tasked with overseeing the dissemination of information and woefully disregarded their functions.

## DERIVATIVE ALLEGATIONS

73.     Plaintiff brings this action derivatively in the right and for the benefit of MongoDB to redress injuries suffered by MongoDB as a direct result of the Director Defendants' breaches of fiduciary duty. MongoDB is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

74.     Plaintiff will adequately and fairly represent the interests of MongoDB in enforcing and prosecuting the Company's rights.

75.     Plaintiff was a stockholder of MongoDB at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a MongoDB stockholder.

## DEMAND FUTILITY ALLEGATIONS

76.     Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

77.     The MongoDB Board currently has nine members: Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman.

78.     Plaintiff has not made any demand on MongoDB's current Board to institute this action against Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

A. **Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman Lack Independence Because They Face a Substantial Likelihood of Liability**

79. As alleged above, Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman breached their fiduciary duties by negligently issuing the materially false and misleading 2024 Proxy soliciting the reelection of Defendants Ittycheria, Botha, and Lewnes to the Board. Accordingly, Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman face a substantial likelihood of negligence liability for issuing the 2024 Proxy and any demand upon these defendants is therefore futile.

80. Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman face a substantial likelihood of liability for their individual misconduct. As alleged above, Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above. Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

81. In addition, Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman knowingly and/or with reckless disregard reviewed, authorized, and/or

caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of MongoDB.

82.     Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman's making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman facing a substantial likelihood of liability. If Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman were to bring a suit on behalf of MongoDB to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman.

**B.      Defendants Ittycheria and Merriman are Not Independent**

83.     Defendant Ittycheria has served as the Company's President, CEO and as a director since September 2014. According to the 2024 Proxy, as of April 26, 2024, Defendant Ittycheria beneficially owned 202,099 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $388.80, Defendant Ittycheria owned approximately $78.6 million worth of MongoDB stock as of that date. Before the material misstatements and omissions described above were exposed, Defendant Ittycheria sold

425,603 shares of Company common stock on inside information, for which he received approximately $156.9 million in proceeds.

84.    Defendant Ittycheria is an executive officer of and currently employed by MongoDB. For the 2024 Fiscal Year, Defendant Ittycheria received $15,257,721 in total compensation from the Company. The Company stated in the 2024 Proxy that Defendant Ittycheria is not independent pursuant to SEC and Nasdaq rules.

85.    Defendant Merriman is a co-founder of MongoDB and was employed by the Company from 2007 until he joined the Board in 2020. In addition, before the material misstatements and omissions described above were exposed, Defendant Merriman sold 71,375 shares of Company common stock on inside information, for which he received approximately $28.1 million in proceeds.

### C.    Defendants Botha, Cochran, and Hazard are Not Disinterested Because They Were Members of the Committee Responsible for Overseeing Financial Reporting

86.    As set forth above, one of the Audit Committee's responsibilities is reviewing and approving MongoDB's Forms 10-Q and 10-K filed during the Relevant Period. Defendants Botha, Cochra, and Hazard were members of the Audit Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, Defendants Botha, Cochran, and Hazard caused the Company to make improper statements. Accordingly, Defendants Botha, Cochran, and Hazard breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

**D.** **Defendants Hazard, D'Souza and Killalea are Not Disinterested Because They Were Members of the Committee Tasked with Oversight of the Board and the Dissemination of Information**

87.     Defendants Hazard, D'Souza and Killalea were members of the Nominating and Corporate Governance Committee, which was responsible for procedures for the dissemination of information and Board and management assessment – which duties and responsibilities were neglected. They likewise face a substantial likelihood of liability for these breaches, making any demand on them futile.

88.     Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

### CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

89.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

90.     Each of the Director Defendants owed and owes MongoDB the highest obligations of loyalty, good faith, due care, and oversight.

91.     Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

92.     The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

93.    In addition, the Director Defendants further breached their fiduciary duties owed to MongoDB by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose material information concerning MongoDB's expected revenue for the fiscal year 2025. Defendants' statements included, among other things, confidence in MongoDB's restructuring of its sales force incentives and reducing pressure on upfront commitments to reduce friction in enrollment, particularly in its ability to acquire new customers, increase growth, and maintain revenue. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

94.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

95.    As a direct and proximate result of the breaches of duty alleged herein, MongoDB has sustained and will sustain significant damages.

96.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

97.    Plaintiff, on behalf of MongoDB, has no adequate remedy at law.

### COUNT II
### Breach of Fiduciary Duty
### (Derivatively Against the Officer Defendants)

98.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

99.    The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe MongoDB the highest obligations of loyalty, good faith, due care, oversight, and candor.

100.    The Officer Defendants breached their fiduciary duties owed to MongoDB by willfully or recklessly making and/or causing the Company to  disseminate materially false and misleading statements and/or conceal material adverse facts concerning related to MongoDB's sales force incentive restructure, including: a significant reduction in the information gathered by their sales force as to the trajectory for the new Atlas enrollments without upfront commitments; reduced pressure on new enrollments to grow; and a significant loss of revenue from unused commitments. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

101.    As a direct and proximate result of the breaches of duty alleged herein, MongoDB has sustained and will sustain significant damages.

102.     As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

103.     Plaintiff, on behalf of MongoDB, has no adequate remedy at law.

### COUNT III
### Violation of Section 14(a) of the Exchange Act
### (Against the Director Defendants)

104.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

105.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

106.     The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2024 Proxy. In the 2024 Proxy, the Board solicited stockholder votes to reelect Defendants Ittycheria, Botha, and Lewnes to the Board.

107.     The 2024 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, MongoDB misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect Defendants Ittycheria, Botha, and Lewnes.

108.     Plaintiff, on behalf of MongoDB, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2024 Proxy in connection with the improper reelection of Defendants Ittycheria, Botha, and Lewnes to the Board.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of MongoDB and that Plaintiff is a proper and adequate representative of the Company;

B.     Against all of the Defendants and in favor of MongoDB for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.     Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.     Awarding MongoDB restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: December 3, 2024                    **ROWLEY LAW PLLC**

*S/ Shane T. Rowley*

Shane T. Rowley (SR-0740)
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
Email: drl@rowleylawpllc.com

*Attorneys for Plaintiff*